## JOSEPH SHERLOCK *et al.*

*v.*

## THE VILLAGE OF WINNETKA *et al.*

1. CORPORATION—*injunction*. A court of equity may grant relief against a municipal corporation as well as against a natural person, in most cases. But there are acts which a corporation may do within the limits of its charter, without being subject to the supervision of any court; such acts are those done under its legislative and discretionary powers.

2.   A municipal corporation, in reference to its property, stands on the same footing as other corporations. Its corporate property is held in trust for the benefit of its constituents, and it is bound to administer such property faithfully, honestly and justly, and if guilty of a breach of trust by disposing of valuable property without any, or for a nominal, consideration, it will be regarded in the light of the representative of a private individual or private corporation. The fact that the forms of legislation are used in committing such a breach of trust, will not change the character of the act. Such is not the exercise of political power, delegated for public purposes, and exemption from judicial interference terminates where legislative action ends.

3.   CORPORATION—ITS POWERS. The common council has no authority to purchase lands, erect buildings, and issue bonds pledging the corporate property and the faith of the corporation, for any but municipal purposes. Where the design in purchasing the land, erecting the buildings and issuing the bonds, is for private, to the exclusion of corporate purposes, and for private gain, it is a gross breach of trust, a fraud upon the law and the tax payers of the municipality, and a court of equity will take cognizance of such a case.

4.   BONDS OF THE CORPORATION—*sale of—void.* The sale of its bonds by a municipal corporation to the members of its council, is void, irrespective of the principles of equity as applied to persons acting in a fiduciary capacity, and independent of the fact that it was a part of a scheme to pervert the property of the corporation from its legitimate municipal purposes to private ends. Such a sale is void, on the ground that no man can contract with himself. If a board of trustees were to convey the corporate property to themselves, the sale would be void, without reference to its fairness or its benefit to the corporation. So, if such a sale is made to one of their members, he being one of the parties contracting with himself.

5.   Nor does it change the transaction, where a portion of the trustees were also trustees of an academy, and to whom the sale was made, and where the sale was for the purpose of fraudulently perverting the corporate property of the municipality to the purposes of a mere private enterprise.

6.   The bonds issued by the corporation to its own members, being void in their hands, they could not be enforced for either principal or interest, and nothing could be due thereon in their hands; and it follows that the levy of a tax for their payment would be illegal, unjust and oppressive to the tax payers.

7.   JURISDICTION IN EQUITY—*for all purposes in the suit.* It is a rule of equity practice, that when the court acquires jurisdiction for one purpose, it will retain it for all purposes necessary to complete justice between all parties interested in the subject matter. Hence the rule that all persons in interest must be parties in equity.

8. MULTIFARIOUSNESS. No rule or abstract proposition as to what constitutes multifariousness, can be stated. But, as a general rule, the joining in one bill distinct and independent matters, will constitute multifariousness.

9. It is not multifariousness to make the collector of taxes a party to have their collection enjoined, and to state in the same bill the grounds and circumstances upon which the relief is sought. Nor is it ground of demurrer to allege, in the same bill, that the common council had passed an ordinance to issue bonds of the municipality for $8000, for the purpose of building a boarding house for the use of an academy, which would be a charge on the tax payers, to do which, would be in furtherance of a fraudulent scheme to pervert the corporate property to private uses, and is germane to the other facts stated in a bill to restrain the collection of taxes imposed by the common council.

10. PURCHASE—*rescission.* Where a municipal corporation has power to purchase land for corporate purposes, and a purchase is made, and in doing so the common council designed to pervert it to private purposes, that affords no ground for cancelling the deed, as the parties could not be placed *in statu quo.* The vendor could not be compelled to pay for the buildings and other improvements placed thereon, and it would be inequitable for him to get them without paying therefor.

APPEAL from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

This was a bill in equity, filed in the Superior Court of Cook county, by Sherlock and twenty-five others, as property owners and tax payers, against the village of Winnetka, the Winnetka Academy, and others, members of the council of said village, and the collector thereof.

It appears, from the allegations of the bill, and the acts of the general assembly referred to therein, that the village of Winnetka was incorporated by a special act. Private Laws 1869, vol. 4, p. 221.

Section 1 of article 2 of the act provides, that the municipal government of said village shall be composed of a president and five trustees, who together shall constitute the council of said village.

These officers are made elective. The same section provides for the election of a marshal, who shall be *ex officio* collector, for an assessor, and other officers.

Section 1 of article 4 provides, that the council shall have power to purchase land in said village, and erect thereon buildings, and make other improvements for an educational institution of a high-grade; to borrow money for such -purposes, and issue bonds of said village in such form and for such amount, and for such time—not less than five years, nor more than twenty years—bearing such rate of interest, not exceeding ten per cent per annum, as the council may by ordinance provide, thereby *pledging the corporate property* and *the faith and credit of said village* for the payment of principal and interest of said bonds, with power to issue other similar bonds in like manner to pay or replace said bonds when they shall become due. Provided, that bonds exceeding in total amount of principal the sum of $20,000, shall not be issued in any one year; and, that the amount of principal of said bonds, outstanding and unpaid, shall not, at any one time, exceed the sum of $50,000.

The 5th section of same article declares the said village to be a school district, and the council to be *ex officio* a board of education, and that in addition to the powers which school directors have by law, the council shall have power to establish grade schools, *and a high school*, to build school houses for the same, and levy taxes for the erection and support of the same.

Superadded to these special powers, is the provision of section 4 of article 3, that: "The council shall have control *of the finances and all the property, real, personal and mixed, within the corporate limits; and* shall have power within said limits, by ordinance," amongst other things, "to provide for, or erect, suitable buildings for the use of said village and its officers."

It appears, from the allegations of the bill, that the "educational institution of a high grade," mentioned in said section 1 of article 4, is, in fact, the Winnetka academy, for the incorporation of which an act was passed at the same session of the legislature which passed the act for incorporating said village. Private Laws 1869, vol. 1, p. 34. The corporators named in the first section of the last mentioned act, were Timothy

Wright, Artemus Carter, R. M. Groves, Oliver W. Belden, David P. Wilder, B. Blake, O. S. Goss, Thomas Bassett and James L. Wilson.

The second section provides, that the concerns of the corporation should be managed by a board of nine trustees. The 3d section declared, that the persons named in the 1st section should constitute the first board, and hold their office for two years, and until their successors were elected and qualified.

It also appears from the bill, that the persons composing the council of the village, during the time of the transactions in question, were Artemus Carter, president, Timothy Wright, Barnum Blake, Julius P. Atwood, Thomas Bassett and O. S. Goss, trustees. Of the remaining officers, Abram P. Anthony was collector, and William H. Garland, assessor.

It further appears, from the allegations of the bill, that on the 7th day of May, 1869, the council passed an ordinance to raise money for the purchase of a lot, and making improvements thereon, authorizing the issue of bonds in the sum of $20,000, by the corporation; that, on the 2d of June, 1869, the council, claiming to act under said 1st section of article 4 of village charter, purchased of said James L. Wilson, block 50, in said village, containing two acres, for $2500, for the purpose of erecting thereon, as was pretended by them, a building for an academy or college; that, during that summer, and the fall of 1869, they did erect and finish, professedly for educational purposes, a large brick building on said block, inclosed the block with a fence, and made other improvements, at an expense of $11,800, or thereabouts; that, during the year 1869, but at what particular time the complainants could not state, the council caused to be issued $18,000 of said bonds, dated in said year, payable ten years after date, with interest coupons for interest thereon, at ten per cent per annum, payable semi-annually at the First National Bank in the city of Chicago; that said bonds were sold by said council at a discount from the face, and yet drew interest upon the

whole amount named in the bonds, at ten per cent per annum; that all the consideration received by said village for said $18,000 of bonds, was the price of said lot, being $2500, and $11,800, or thereabouts, the cost of said improvements, making in all $14,300, or thereabouts; that the difference of $3700, or thereabouts, was allowed by said council as discount or shave money in getting the bonds cashed; that said council sold all, or nearly all, of said bonds, to the individual members of said council; that Wilson was paid in bonds, in whole or in part, for said lot, and the balance of $15,500 were sold to the members of said council, by the council, at seventy-five cents on the dollar, or thereabouts, said Carter taking the largest share of them at that rate, or about that rate, and said Goss, Bassett and Wright, taking a portion of them; that Carter, Bassett and Wright, and other members of the council, and said Wilson, combining together, have so managed the business by keeping their transactions secret, that the complainants have been unable to obtain further information as to the issuing of the bonds, or as to who are the present holders thereof.

The bill further alleges, that after the erection of said building on said block, the council, about the 30th of March, 1870, passed an ordinance for leasing said block and the improvements thereon, to said Winnetka academy, for the term of three years from the 1st of July, 1870, at a nominal rent, the condition of such letting being, that the academy should pay all taxes and assessments on the property; and inasmuch as said building and grounds are by law exempt from taxation, such letting amounts to a free lease of said premises; that said measure was adopted by the vote of said Atwood, Bassett, Wilder and Wright, and that said Bassett, Wilder and Wright, were at the same time corporators in said academy, and that, by their action, they thus virtually donated the use of said building and grounds to said academy, for the term of three years, which was, in fact, taking the property of the people and bestowing it upon themselves, without consideration, for

their own benefit and interest; that, in accordance with such pretended lease, said academy took possession of said premises July 1st, 1870, and have continued such possession, and are conducting a private school in said building for their own gain and benefit.

The bill further alleges, that said council have not used, had not intended, and never have intended, to use the lands so purchased, or the building or buildings so erected thereon, for an educational institution of a high grade, for corporate purposes; but that the same was designed by the council for, and has already been appropriated to, the use of the private corporation as aforesaid, for private gain, and wholly foreign to the corporate purposes of said village; that, on the 7th of October, 1870, the council passed an ordinance directing the levy of a tax of thirteen mills on a dollar of the assessed value of real and personal property, eight mills of which is on account of said bonds, and to pay the interest thereon; that a warrant had been issued for the collection of said tax, and placed in the hands of said Abram P. Anthony, collector, who threatens to collect said tax by levying on the property of complainants, and that said collector is insolvent.

The bill also alleges, that the assessor completed the assessment of property, real and personal, for the year 1870, in said village, including the property of complainants; had signed and returned the list to the council about August 1st, 1870; that, in said list, he had assessed the property of the Chicago & Milwaukee Railway Company, on track, $11,500; on rolling stock, $8700; that, on September 21, 1870, the council directed their clerk to change said list, making a total reduction of the assessment of the property of said company, for the purposes of taxation, of $4700, and also directed the clerk to make a reduction of $550 from the assessed valuation of the personal property of O. S. Goss, one of the members of the council, which was accordingly done. But the bill does not allege that the property assessed as to which the reduction was made, was subject to taxation by the village authorities,

or that Goss participated, as member of the council, in ordering the reduction as to his property.

The bill also alleges that said council have already taken action towards building a large boarding house adjoining said academy, on block 50, and have, by ordinance, provided for issuing additional bonds of said village to the amount of $8000 for that purpose ; charges that the proceedings of said council and said academy, as therein before set forth, and the proposed erection of said boarding house, and the issuing of bonds, etc., are fraudulent, illegal and unjust, as against complainants as tax payers ; the bill was sworn to, praying for an injunction and relief; a temporary injunction was awarded ; defendants entered their appearance, and interposed a general demurrer, which was sustained, the injunction dissolved, bill dismissed, and damages awarded against complainants for suing out the injunction. Complainants brought the case to this court by appeal, and assign for error the rulings of the court as stated.

Mr. GEORGE SCOVILL, for the appellants.

Mr. J. P. ATWOOD and Mr. S. A. IRWIN, for the appellee.

Mr. JUSTICE MCALLISTER delivered the opinion of the Court:

The bill in this case is not very artificially drawn, but upon a critical examination of it, we find the defects to be simply the want of chronological order in the statement of facts, and of logical order in the arrangement of the matters of its contents. Notwithstanding these defects in form, we find facts scattered through it, sufficiently stated to entitle the complainants to relief, and the *gravamen* of the whole is very apparent. The substance of the matters alleged is, that while the council were authorized by section 1 of article 4 of the charter, to purchase land and erect buildings thereon for an educational institution of a high grade, to borrow money, issue bonds and levy taxes for that purpose, still, such institution was designed

by the act to be for corporate uses only, or else that portion of the act must be held unconstitutional and void; that the council, though pretending to act under the authority of this act, purchased the land and erected the building thereon, as set forth, with the original design of not having the same appropriated to the corporate uses of the village as an institution of learning, but of directly appropriating it to private use, for the purposes of private gain and emolument—a portion of the members of the council being incorporators and trustees of the Winnetka academy; that, in pursuance of such design, the land was purchased of one of the trustees of the academy, and the building and other improvements placed upon it; bonds of the village were issued to the amount of $18,500, bearing ten per cent interest, payable semi-annually at a national bank in Chicago; $2500 of these bonds were delivered to the trustee of the academy of whom the land was purchased, in payment thereof. The balance of $15,000 in bonds, the council sold at the rate of seventy-five cents on the dollar, to certain individual members of the council, of which Carter, the president of the council, took the largest share. Three members of the council being also trustees of the academy corporation, the council passed an ordinance to lease said land, and the buildings and improvements so purchased and constructed by said bonds, or their proceeds, to said academy—a private corporation, to be carried on as such, for private gain, for the term of three years, upon condition that such academy corporation should pay all taxes and assessments, when such land and property were not legally liable to taxation—the three members of the council, who were trustees of the academy, voting for said ordinance at its passage.

Then, as a crowning act, the council, while certain of its members were purchasers of these bonds at a sale by the council, and must be presumed, in the absence of anything to the contrary, to be still the holders of them, passed an ordinance directing the levy of a tax upon the inhabitants of the village,

and owners of property therein, to pay themselves the interest upon said bonds.

Nor is this all. The bill alleges, and we are bound to take all allegations of fact well pleaded as admitted by the demurrer, that the council are about to erect a boarding house on said land, for the use of said academy, and to that end have passed an ordinance to issue the bonds of the village to the amount of $8000 for that purpose.

Such, substantially, are the grounds, presented by the bill, for prevention and relief. The court below sustained a general demurrer to the bill, dismissed it, dissolved the temporary injunction which had been allowed and issued upon it, and awarded damages against complainants for having obtained the injunction.

Relief may be granted by courts of equity against a municipal corporation, as well as against a natural person. The first section of the charter of the "village of Winnetka" declares "that by said name, the corporation may sue and be sued in all courts of law and equity in this State."

There are some acts which a municipal corporation, while acting within the limits of its charter, may do, without being subject to the supervision of any court. Such acts are those done under its legislative and discretionary powers.

The question as to the true boundary line between exemption from supervision, and liability to it, has received a thorough and critical examination in the courts of New York. *Milhau* v. *Sharp*, 15 Barb. 194; *Davis* v. *Mayor*, 1 Duer, 453. In these cases, it was held that a municipal corporation, in reference to its private property, stands upon the same footing of other corporations; that its corporate property is held in trust for the benefit of its constituents, and the corporation is bound to administer such property faithfully, honestly and justly, and if it is guilty of a breach of trust by disposing of its valuable property, without any, or for a nominal, consideration, it will be regarded in the same light as if it were the representative of a private individual, or of a private corporation; that the

mere fact in such a case, that the forms of legislation are used in committing such breach of trust, will make no difference in the character of the act. It will not be, in any sense, the exercise of a political power delegated for public purposes, and the privilege of exemption from judicial interference terminates where legislative action ends.

See, also, *Attorney General* v. *Utica Insurance Co.* 2 Johns. Ch. R. 389.

The council had no authority to purchase land, erect buildings, and issue bonds pledging the corporate property, and the faith and credit of the corporation, for any but corporate purposes. If the original design was, as is alleged, and which the facts stated seem to warrant, to purchase the land, erect the building and issue the bonds, for *private* uses, to the exclusion of *corporate* purposes, and for private gain, it was a gross breach of trust, a fraud upon the law and the tax payers of the village, and a court of equity should take cognizance of the case, by virtue of its inherent jurisdiction over fraud and trusts.

The sale of the bonds of the village, by the council to its own members, was void, irrespective of the principles of equity applied to the dealings of parties holding a fiduciary relation to each other, or of considerations arising from the fact that it was part of a scheme to pervert the property of the corporation from its legitimate corporate uses to mere private ends. It was void, on the ground that no man can contract with himself.

"It is said that the contracts of trustees are of two classes: One class consists of contracts made by trustees with themselves, or with a board of trustees or directors of which they are members. These contracts are void, from the fact that no man can contract with himself. If, therefore, a board of directors should convey all the property of a corporation to themselves, the conveyance would be void without any inquiry into its fairness, or whether it was beneficial to the corporation or not; and the same rule applies, if a board of directors

convey the property of a corporation, or any part of it, to one of their members, he being one of the trustees negotiating the contract with himself." Perry on Trusts, sec. 207, and cases cited in notes supporting the text.

And inasmuch as three members of the village council were also trustees of the academy, and participated in negotiating the contract for the lease from the former to the latter, it is difficult to perceive any reason why that transaction does not also fall within the principle of the authorities holding void a contract made by trustees with a board of trustees or directors of which they are members. However that may be, the contract should, under the circumstances stated in the bill, be held void, on the ground of its being a fraudulent perversion of the private property of the village, held in trust for corporate uses, from such uses, to those of a mere private enterprise.

It follows, from the views expressed, holding the sale of the bonds by the council to its own members to be void, that such bonds could not be enforced in the hands of such holders, for either principal or interest, and this, upon the ground that, the sale being void, there was nothing due to such supposed holders. If no interest was due upon the bonds in such hands, then it also follows that the levy of the tax by the council to pay it, was illegal, unjust and oppressive, as to the tax payers.

It is insisted, on behalf of appellees, that the demurrer to the bill was properly sustained, on the ground of multifariousness. No such cause is assigned by the demurrer, and we shall not stop to investigate the question of practice, whether the specification of this ground was indispensable; for we are of opinion that the bill is not obnoxious to demurrer for that cause, even if it had been specified.

It is an established rule, that where chancery takes jurisdiction for one purpose, it will retain it for all purposes necessary to complete justice between all parties interested in the subject matter. The policy of the rule is, the prevention of

a multiplicity of suits, and from it has sprung the other rule, which requires all persons interested to be made parties; so, that to do adequate and complete justice between all parties interested, may be said to be a prevailing motive of equity. This motive, together with a conceded absence of technical rules in respect to the statements of the bill, has ever afforded a fruitful source of perplexing questions as to the proper unity of the matters set forth, their relations to persons and to each other. As civilization advances, and the subtlety of the human intellect increases, the transactions of mankind become more complicated; but, from a variety of causes, attention to the principles of correct pleading seems to become more lax. From these causes, the difficulty of the questions mentioned seems to continually increase.

It was said by Lord COTTENHAM, that it was utterly impossible, upon the authorities, to lay down any rule or abstract proposition, as to what constitutes multifariousness, which can be universally applicable. 1 Dan. Ch. Pr. 384. So our own great equity judge: "The conclusion," says Story, "to which a close survey of all the authorities will conduct us, seems to be that there is not any positive, inflexible rule, as to what, in the sense of courts of equity, constitutes multifariousness, which is fatal to a suit, on demurrer." Story Eq. Pl. sec. 539. Still, in the same work, sec. 271, he gives the following definition: "By multifariousness in a bill, is meant the improperly joining in one bill, distinct and independent matters, thereby confounding them; as, for example, the writing in one bill of several matters *perfectly distinct* and *unconnected*, against one defendant, or the demand of several matters of a *distinct* and *independent* nature against several defendants in the same bill."

The charge of multifariousness is based, in this case, principally upon the fact of making the collector a party, and the matters alleged as ground for restraining the enforcement of the tax warrant in his hands.

26—59TH ILL.

This was not a distinct, independent matter. The tax warrant was the very instrument by which the wrong was to be consummated. The illegal sale of the bonds, by the council to its own members, to raise money to pay for property which they were appropriating to private use, and levying a tax to pay themselves interest upon such bonds, were the matters set forth, showing the wrong and oppression of the tax payers. Making the collector, who had the warrant for the collection of this tax, a party, was upon the same principle that a defendant to a judgment, who should file a bill to set it aside for fraud, would be compelled to make the sheriff a party, if an execution was in his hands, upon the judgment, although the latter in no manner participated in the original fraud.

So, also, the allegations of the bill that the council were proceeding to erect a boarding house for the use of the academy, and for that purpose had passed an ordinance to issue bonds of the village to the amount of $8000, which would be a charge upon the property of tax payers. To build such a boarding house, would, under the facts stated, be an act in furtherance of the fraudulent scheme of appropriating the private property of the corporation, held in trust for corporate uses, to private uses, and is so connected with the substantive matter of the bill, that, as a branch, it must perish with the trunk.

We are of opinion, however, that the facts stated in regard to the alleged diminution of valuation by the assessor, of property assessed, are not sufficient to defeat the whole tax. There is no allegation that the property in respect to which the council directed the clerk to make the diminution, was subject to taxation by the village authorities, or that Goss, as a member of the council, participated in having the change made as to his property.

Nor is there a case shown for rescinding the purchase of block 50 from Wilson. Improvements have been made upon the land at great expense. Authority was given by the village charter to purchase the land and erect the building for

corporate uses; so that the purchase was not made without authority. Even if the members of the council designed, from the beginning, to pervert the land and building to private uses, for their own private benefit, and there was fraud in the purchase, the contract with Wilson should not be rescinded, because the parties can not be placed *in statu quo*. He can not be compelled to take the building and pay for it, and it would be inequitable for him to have it, as he would if he took his land back, without paying for it. If the village corporation have title to the land, neither Wilson nor the individual members of the council can ask to have it divested. As to the equities between the corporation and the individual members of the council who illegally assumed to purchase the bonds, we express no opinion, but simply hold, that as the facts appear in this record, such sale was void, and no title acquired by it; that the tax levied to pay the interest on the bonds was illegal, and to that extent the collector should be restrained in the execution of the tax warrant; that the appropriation of the private property of the corporation, held in trust for corporate uses, to the mere private uses disclosed by the bill, was a fraud and breach of trust which calls for the interference of a court of equity; that the bill is not bad for multifariousness, and as it contains matters showing fraud and breach of trust, it can properly be met only by answer.

For these reasons, the decree and order of the court below sustaining the demurrer, dismissing the bill and awarding damages, will be reversed and the cause remanded, with directions to that court to overrule the demurrer and permit the defendants to answer.

*Decree reversed.*